[Civ. No. 23271.   Second Dist., Div. Three.   Jan. 26, 1959.]

RAYMOND M. HEMPHILL, Appellant, v. CONTRAC-
TORS' STATE LICENSE BOARD et al., Respondents.

Sweeney, Stearns & Foye for Appellant.

Edmund G. Brown, Attorney General, and Miles J. Rubin,
Deputy Attorney General, for Respondents.

VALLÉE, J.—Appeal by petitioner, Raymond M. Hemp-
hill, from a judgment denying a writ of mandate to compel
the Contractors' State License Board to restore petitioner's
contractor's license.

Since November 1953 petitioner has been licensed by the
board as a general building contractor.   On May 24, 1956,
an accusation was filed by an investigator of the board wherein
Hemphill was charged with having improperly diverted funds
received under the terms of a written contract for the con-
struction of a single family residence and garage; departing
from plans and specifications in seven instances to the preju-
dice of the owners, Robert H. and Florence Rosenberg; fail-

ing to complete construction for the price stated in the contract; and presenting false statements to Mr. Rosenberg for labor and materials in violation of sections 7108, 7109, 7113 and 7116 of the Business and Professions Code.

A hearing was conducted by a hearing officer, after which he found that Hemphill had violated section 7116[1] in that he breached his fiduciary duty to the owner with the intent of making a secret and undisclosed profit by submitting false statements for materials and services rendered and by permitting subcontractors to wilfully deviate from the plans and specifications to the material prejudice of the owner. The hearing officer recommended revocation of Hemphill's license and his recommendation was adopted by the board.

It was stipulated that at all times mentioned in the accusation Hemphill was acting as and in the capacity of a contractor under the provisions of chapter 9, division 3, of the Business and Professions Code.

Hemphill petitioned the superior court for a writ of mandate. The court found that the decision and order of the board are supported by the weight of the evidence. Judgment followed denying the writ. Hemphill appeals.

In his brief Hemphill concedes he was acting as a contractor in his relationship with the Rosenbergs. As pointed out, he so stipulated before the hearing officer and the latter so found. Hemphill takes the inconsistent position that he might be exempt from disciplinary proceedings on the theory he acted as an employee of the Rosenbergs rather than as a contractor, and therefore the board was without jurisdiction to discipline him. (See Bus. & Prof. Code, § 7053.) In view of the stipulation, the point is without merit.

The question is solely whether the evidence, viewed in the light most favorable to respondents, sustains the finding of the trial court. (*Manning* v. *Watson,* 108 Cal.App.2d 705, 712 [239 P.2d 688].)

The written contract entered into between Hemphill and the Rosenbergs provided that bids had been obtained from subcontractors as per plans and specifications; Hemphill would act as owners' agent and supervisor of construction with diligence until completion; the owners would pay all subcontractor and material supply bills approved by Hemp-

---

[1]Section 7116: ''The doing of any wilful or fraudulent act by the licensee as a contractor in consequence of which another is substantially injured constitutes a cause for disciplinary action.''

hill; and the total cost of the bids and supervision was not to exceed $23,620.44.

Rosenberg testified that at the time the contract was executed it was orally agreed that Hemphill would supervise construction for $1,200, payable $100 a week. He stated Hemphill, who drafted the contract, told him he did not want to set this out in the writing because he did not want the subcontractors to know he was doing the job under a supervisory arrangement as they would not approve of it.

Construction commenced about January 28, 1955. Hemphill hired the subcontractors and controlled the work, and for a period of 12 weeks from January 28 to April 23 received $100 a week from Rosenberg. Hemphill paid the subcontractors' bills and obtained waivers of liens for material and labor furnished. Hemphill never presented the bills to Rosenberg until after his discharge when demand was made on him for them by Rosenberg. Instead, he prepared and submitted to Rosenberg 11 written statements itemizing the cost of labor and materials furnished by the subcontractors. He admitted that a number of items in the statements were in excess of the amounts he had actually paid to the subcontractors. They were as follows:

| Type of work: | Amount claimed by Hemphill: | Amount paid by Rosenberg: | Amount paid subcontractors by Hemphill: |
|---|---|---|---|
| Rough carpentry | $1,775.00 | $1,775.00 | $1,390.00 |
| Sewer work | 300.00 | 300.00 | 234.00 |
| Metal work | 214.00 | 214.00 | 107.50 |
| Roof | 960.00 | 960.00 | 810.00 |
| Sliding door | 241.00 | 241.00 | 172.68 |
| Cabinets | 1,045.00 | 1,045.00 | 855.95 |
| Garage door | 75.00 | 75.00 | 58.50 |
| Hardwood Flooring | 503.00 | 503.00 | 471.00 |

According to Hemphill his billing practice was to determine in his own mind when he was going to be billed by the subcontractors for the work then in progress, refer back to his original cost breakdown and bill Rosenberg according to his estimate of the percentage of work done and the estimated cost in the breakdown, so that he would receive the money from Rosenberg in advance of billings by the subcontractors. After receipt of bills from subcontractors for completed work and materials furnished, Hemphill gave no credits and made no adjustments on any of the later statements to Rosenberg, with one minor exception in which he credited Rosenberg with

$11.37 as an "adjustment on Med. Cab." which he had billed at $73.37 to Rosenberg the previous week.

In reliance on the statements, Rosenberg gave Hemphill checks for the amounts shown thereon to be due. On June 20, at the request of Rosenberg, Hemphill had a cost breakdown prepared for Rosenberg to submit to a bank in applying for a loan to complete construction. It contained items under the headings "Payments to Sub-Contractors as of June 20, 1955 . . ." and "Estimated Amount Needed to Complete," reflecting the same false figures (except for a sliding door), as appeared in the statements previously submitted to Rosenberg. Hemphill admitted the figures were not correct but stated that he put them down anyhow with knowledge that the document would be submitted to the bank and that the bank would probably rely thereon.

At no time during construction did Rosenberg learn of the overcharges in the statements, and he denied asking Hemphill to falsify the figures. Rosenberg discharged Hemphill on June 27 and had the construction completed at an expenditure of $2,244.10 more than the contract price. As of the date of discharge Rosenberg had paid Hemphill $20,204.89, including the $1,200 fee, and Hemphill had paid the subcontractors about $18,300.19. Thereafter Hemphill disbursed an additional sum of $514.62 which paid up all expenses for which he had been billed to the date of his discharge. He testified he made a profit of $189.06 in addition to his $1,200 fee as supervisor. There is no evidence in the record of an agreement that Hemphill was to receive a profit over and above the $1,200 fee, other than his testimony to that effect. Hemphill told Rosenberg any savings made during construction would either be refunded or credited against the estimated cost.

Hemphill's claim that he could have completed construction, including correction of the deviations, for the original contract price of $23,620.44 if he had not been discharged is contrary to the statement and figures attached to the cost breakdown sheet on which he had indicated the "Estimated Amount Needed To Complete as of June 20, 1955" was "$5,250.59."

The plans and specifications called for a side porch with bases thereon to support wooden pilasters on each side of a window by the porch entrance. Although there were no specific figures on the plans showing the dimensions of the porch, it was drawn to scale. As scaled by Rosenberg and a building inspector for the city of Palos Verdes Estates it was

over 8 feet in length. Rosenberg testified that instead of an 8-foot porch, a 3-foot stoop was installed and no bases were provided to support the pilasters so that they appeared to be hanging in air. Testimony of the building inspector and an investigator for the board was to the same effect, and photographs admitted in evidence show the installation and its awkward appearance. Hemphill admitted he had installed a stoop-type porch but stated he discussed it with Rosenberg and the subcontractor before the work was done and Rosenberg was happy about the way it was going to be. A reading of his testimony discloses, however, that the discussion was limited to the direction in which the steps should lead, since they were not shown on the plan, and the dimensions of the porch were not given. Hemphill also admitted discussing with the cement contractor the cost of making the correction, and the extension of the porch to 8 feet at an estimated cost of $25 was listed by him among items to be corrected. Rosenberg testified that he could get no satisfaction from Hemphill in correcting the work; Hemphill said the stoop was all right the way it was installed; and after Hemphill's discharge he had the stoop converted into a porch at the cost of $25.

The plans and specifications also called for a full concrete foundation of a minimum height of 18 inches on the interior walls. An investigator for the board testified the walls were dwarfed and wooden crippling was substituted for some of the solid walls of cement. Hemphill admitted the walls had been crippled but testified that when he talked to Rosenberg about making the change he told him (Rosenberg) the cement contractor said it would save time and a few dollars and Rosenberg authorized the change. Rosenberg testified he did not authorize the crippling; he specifically told Hemphill he had to comply with the plans and specifications and he was assured by Hemphill that the walls would all be solid concrete. There is no evidence that Hemphill ever offered to correct the work.

We conclude that the board had jurisdiction to discipline Hemphill and that the evidence amply supports the finding that he breached his fiduciary duty with the intent of making a secret and undisclosed profit by submitting false statements to Rosenberg for materials and services and by permitting the subcontractors to deviate from the plans and specifications.

Affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.